IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| PENHALL COMPANY, et al, | ) | |
| | ) | No. 40453-6-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | UNPUBLISHED OPINION |
| OF LABOR AND INDUSTRIES, | ) | |
| | ) | |
| Respondent. | ) | |

STAAB, J. — This case concerns the prevailing wage act (PWA) and the classification of 37 Penhall Company (Penhall) employees who used specialized equipment to locate "embedments" within concrete for the "Sound Transit Link Extension Project" on the I-90 floating bridge across Lake Washington (E-130 Project). The primary question before this court is whether the Department of Labor and Industries (L&I) met its burden of proving that the employees were properly classified as "construction site surveyors" under WAC 296-127-01396 thereby entitling them to the prevailing wages rate set for that scope of work. On review, the director of L&I affirmed the classification and found that L&I had met its burden of proving Penhall violated the PWA.

Penhall raises several arguments on appeal from the director's final order. Primarily, Penhall challenges the director's interpretation of the scope of work for construction site surveyors. Penhall also assigns error to the director's imposition of a "strike" toward debarment notwithstanding that Penhall's violation was found to be inadvertent. Additionally, among several other arguments, Penhall asserts it was entitled to have the matter heard by a jury under article I, section 21 of the Washington State Constitution. Both parties request attorney fees.

We hold that the director erred by imposing a strike against Penhall for an inadvertent violation but otherwise affirm the director's order concluding that the work performed by GPR (ground penetrating radar) analysts and x-ray technicians is properly classified as construction site surveyors for purposes of determining the proper wage rate under the PWA. We award L&I its attorney fees as the substantially prevailing party.

BACKGROUND

A. Background on the Prevailing Wage Act

*Wages, benefits and overtime*

The PWA applies broadly to laborers, workers, or mechanics employed on public works projects. RCW 39.12.020. When the PWA applies, the hourly wages are based on the prevailing rate of wage paid for similar work in the locality where the work is performed. *Id.* To determine this rate, the industrial statistician first determines the

worker's established trade or occupation and then determines the rate of hourly wage for that established trade or occupation. WAC 296-127-013(3), (4), -019.

The "established trades and occupations" are set forth in L&I's scope of work descriptions. WAC 296-127-013(2), -019. Currently, there are 65 WACs setting forth the recognized established trades and occupations. WAC 296-127-01301 to WAC 296-127-01398, *see also* https://www.lni.wa.gov/licensing-permits/public-works-projects/scopes-of-work. L&I's director or designee is responsible for the creation of the scope of work descriptions. WAC 296-127-013.

To determine the prevailing rate of wage assigned to a scope of work, the industrial statistician follows the multistep procedure set forth in WAC 296-127-019. RCW 39.12.015(1), (3). The "prevailing rate of wage" is defined as "the rate of hourly wage, usual benefits, and overtime paid in the locality . . . to the majority of workers, laborers, or mechanics in the same trade or occupation." RCW 39.12.010(1). Thus, the "prevailing rate of wage" is comprised of three parts: the hourly wage, usual benefits, and overtime.

"Usual benefits" under RCW 39.12.010(1) are those set forth in WAC 296-127-014 and RCW 39.12.010(3) and include benefits such as medical insurance, life insurance, retirement accounts, vacation pay, apprentice training funds, and paid holidays. These are also referred to as "fringe benefits." *See* RCW 39.12.010(3)(b);

WAC 296-127-014(4).[1] The employer's cost of fringe benefits can be used to "offset" the full prevailing wage rate. RCW 39.12.010(3); WAC 296-127-014(1). Stated another way, an employer can get a credit for the amount an employee's fringe benefits cost the employer, and that credit reduces the hourly rate of pay that must be paid to a worker on a prevailing wage project.

Regarding overtime, the industrial statistician has adopted a regulation that entitles workers covered by the PWA overtime for hours worked in excess of 8 hours per day, unless the worker and employer have entered into a voluntary, written agreement for four, 10-hour days. WAC 296-127-022.

*Filing of certified records*

Under the PWA, employers must keep accurate payroll records for each laborer, worker, and mechanic employed to work on a public works project and supply those records to L&I. WAC 296-127-320(1), (2). A failure to keep accurate payroll records or supply them to L&I constitutes a violation of the PWA under RCW 39.12.050. WAC 296-127-320(3).[2] RCW 39.12.050 provides penalties for an employer's filing of false statements or failure to file. The penalties include imposition of a civil penalty in the

---

[1] The parties refer to these benefits as "fringe benefits" throughout the record. *See, e.g.*, AR at 8384.
[2] RCW 39.12.120 was added in 2020 requiring the employer to automatically file payroll records. Prior to January 1, 2020, the employer was only required to provide them upon L&I's request. *See* RCW 39.12.110.

4

sum of $500 for each false filing or failure to file. RCW 39.12.050(1). An employer is also not "permitted to bid, or have a bid considered, on any public works contract until the penalty has been paid in full." RCW 39.12.050(1).

Penalties for violations under RCW 39.12.050 escalate for each subsequent offense. Each violation is thus commonly referred to as a "strike." Upon the first strike, only the $500 civil penalty may be imposed. Upon the second strike within a five-year period, the employer is again subject to the $500 civil penalty under RCW 39.12.050(1) as well as the added penalty of being prohibited—"debarred"—from bidding on any public works contract for one year. RCW 39.12.050(1), (2). However, not all violations are subject to penalties set forth in RCW 39.12.050. Where the director determines the filing or reporting error to be inadvertent, the civil penalty under RCW 39.12.050 does not apply. RCW 39.12.050(1).

*Penalties for failure to pay prevailing wages*

Similar to RCW 39.12.050, RCW 39.12.065(3) sets forth escalating penalties for employers who fail to pay prevailing wages. At the time of Penhall's violation,[3] former RCW 39.12.065(3) (2009) set forth that upon the first strike for a prevailing wage violation, an employer is subject to a civil penalty in the amount "not less than one thousand dollars or an amount equal to twenty percent of the total prevailing wage

---

[3] RCW 39.12.065 was amended in 2019, increasing the penalties.

violation found on the contract, whichever is greater." "The employer is not permitted to bid, or have a bid considered, on any public works contract until [the imposed] civil penalty has been paid in full." As with RCW 39.12.050, under RCW 39.12.065, a second strike within a five-year period subjects the contractor to the outlined civil penalties and as an additional sanction, the contractor is debarred from bidding on any public works contract for two years. RCW 39.12.065(3). Here too, where the violation is found to be inadvertent, the civil penalty and sanctions under RCW 39.12.065 do not apply. RCW 39.12.065(3).

B. Factual Background

This matter stems from Penhall's work on the E-130 Project on the I-90 floating bridge from Mercer Island across Lake Washington. Penhall was a subcontractor of Kiewit-Hoffman, the primary. Penhall performed work that included, inter alia, concrete saw cutting, core drilling, slab sawing, concrete grinding, profile grinding, GPR scanning, digital x-ray concrete imaging, and concrete removal. The issues before this court involve the 37 Penhall employees who used GPR scanning and x-ray imaging to detect and locate "embedments"—buried objects contained within the concrete structures such as rebar and post tension cables. On appeal to this court, Penhall challenges the classification of these workers under the construction site surveyor scope of work. Penhall does not challenge the wage rate assigned to this scope of work.

*The work performed by GPR analysts and x-ray technicians*

Penhall Company has been a concrete core drilling and saw cutting company since 1957. In 2016, due to increased demand in specialized technology, Penhall created a division called Penhall Technologies. Because this distinction between company divisions is not otherwise relevant to the issues before this court, we refer to Penhall Company and Penhall Technologies simply as "Penhall."

Penhall began working on the E-130 project in the summer of 2017. To avoid striking embedments in the concrete, Penhall utilized GPR scanning and digital x-ray imaging to assist concrete cutting and drilling crews. On July 17, 2017, Penhall filed a "Statement of Intent to Pay Prevailing Wage." AR at 1015-17. In this statement, Penhall identified laborers in the occupations of concrete saw operator/core driller, and general laborer as those employees entitled to prevailing wages. Penhall's statement of intent did not include its GPR analysts or x-ray technicians.

The work of GPR concrete scanning and x-ray concrete imaging detects subsurface objects in concrete. However, they use different methods to do so. X-ray technicians use an x-ray system that consists of an electronic device that generates x-rays and a receiver panel or plate that captures the image of the x-ray on the other side. In addition to the x-ray system, x-ray technicians utilize several safety items such as Geiger counters and other radiation measurement devices. X-ray imaging is limited insofar as it requires access to both sides of an area sought to be imaged.

X-ray technicians work in teams of two. One worker works with the x-ray emitter and uses lasers mounted to the emitter to line it up with the area to be imaged. That worker also controls the milliamps and KV,[4] which affects the penetrating power and how many x-rays are generated. The other worker positions themself on the opposite side of the wall with a digital detector plate that is an x-ray sensitive crystal attached to a computer. The detector plate captures the x-rays which produces an image.



*Image produced by x-ray*. AR at 1473.

GPR analysts use an electronic device called a Mini XT, which is a handheld electronic device with four wheels that is rolled over the concrete surface and sends a radar signal through the concrete. The radar signal bounces back to the instrument and creates a visual graph on the screen. If an embedment is below the device, a parabola is

---

[4] The transcript simply refers to "KV," and is not further explained.

depicted on the screen. The device has lasers mounted to it such that as the device depicts a hyperbola signifying an embedment, the lasers line up with the location of the embedment, it signifies the antenna is directly over the peak of the parabola. The screen has numbers across the top and along the side for calculating the distance, width, and depth. A more elaborate procedure using several scans imported into a computer program can produce a three-dimensional cross-section of the scanned area. The GPR analysts cannot see exactly what is beneath the concrete using the Mini XT. Instead, the analysts use the surroundings, the image displayed on the device, and their experience to provide their best estimate of what lies beneath the concrete. GPR analysts can typically pinpoint an embedment within a couple of inches of accuracy.

If an embedment is located beneath the concrete, the GPR analyst or x-ray technician uses a "crayon" to draw markings on the concrete to depict the embedment. Different colors of crayon are used to signify different types of embedments such as post-tension cables or rebar. In some instances, drawings indicate the depth of the embedment. GPR analysts and x-ray technicians did not provide a warranty or guarantee for their work on the E-130 project.





*Image on left depicts the Mini XT machine.* AR at 1490.

*Image on right shows the screen and parabola on the Mini XT.* AR at 1479

Prior to the use of the advanced technology of GPR scanning, Penhall employees used a "ferroscan" to detect subsurface hazards or objects. The ferroscan can detect ferrous objects such as metal or iron. The ferroscan works similar to a stud finder; it lights up a green or red light to indicate whether an iron embedment is present. However, the ferroscan has limitations: it cannot detect post- and pretension cables, which are typically enclosed in plastic sheathing.

*Request for clarification, challenge to L&I's determination*

In November 2016, before Penhall began working on the E-130 project, Penhall sought a determination from L&I regarding the scope of work for concrete scanning. In December 2016, an industrial relations specialist with L&I, advised Penhall that GPR scanning and x-ray imaging work, performed in direct support of construction, fell within

the scope of work for a construction site surveyor under WAC 296-127-01396 and was subject to prevailing wages.

Penhall attempted to challenge the determination that the workers in question were construction site surveyors by emailing L&I's industrial statistician, Jim Christensen, twice and asking him to make a formal determination. Christensen had no recollection of ever having responded to that email.

*Complaint and L&I's investigation*

Thomas Garcia was hired by Penhall company in 2018 as an assistant industrial radiographer. He began work on the E-130 project in April 2018 and received a rate of $38.57 an hour. Although he was hired as an assistant industrial radiographer, Garcia was trained and performed both x-ray imaging and GPR scanning.[5]

Garcia typically worked 10-hour days, five days a week on the E-130 project, scanning and x-raying both the pontoons and deck of the bridge. He did not sign a written agreement with Penhall to work 10-hour shifts, four days a week. Although he typically worked 10-hour days, some weeks Garcia worked fewer than 40 hours in a week. He did not receive overtime for hours worked beyond 8 hours in a day, only those

_____

[5] The positions of industrial radiologist and GPR analyst are separate positions within Penhall. However, the parties and the testimony largely treat the occupations as able to be done by one person for the analysis of the scope of work. X-ray technicians used GPR devices alongside x-ray machines to determine the depth of objects.

11

worked beyond 40 hours in a week. Garcia left his employment with Penhall in December 2018.

On February 7, 2019, Garcia filed a complaint with L&I against Penhall. Garcia alleged that he believed his occupation was not properly classified. He asserted that he should have been classified and paid as a construction site surveyor and he should have been paid overtime for hours worked beyond 8 hours in a day as opposed to 40 hours in a week. Garcia's rate of pay at $38.57 per hour together with fringe benefits in the amount of $2.43 per hour totaled less than the prevailing wage for construction site surveyors, which ranged from $58.69 to $63.76 between 2016 and 2019.

Garcia's complaint triggered a prevailing wage investigation. After Penhall provided a list of tools used and tasks performed by GPR analysts and x-ray technicians, L&I informed Penhall that the GPR analysts and x-ray technicians working on the E-130 project were entitled to prevailing wages at the construction site surveyor rate of pay.

*Notice of violation*

Based on the information gathered, Jim Christensen signed and issued a notice of violation (NOV) to Penhall. The NOV set forth three primary allegations: (1) 37 Penhall employees were not compensated at the required prevailing rate of wage for the classification of labor performed (construction site surveyor), (2) those same employees were not paid overtime at a rate of time-and-one-half for hours worked in excess of 8 hours per calendar a day, and (3) Penhall filed false certified payroll records when it

12

submitted records it stated were complete, but were missing the 37 Penhall employees in question. The first two allegations were violations of RCW 39.12.065, and the third was a violation of RCW 39.12.050.

The NOV set forth that the gross amount of unpaid prevailing wages owed to the workers was $501,758.70 as well as $146,850.98 interest on the same. It stated that a 20 percent civil monetary penalty in the amount of $100,351.74 may be assessed under RCW 39.12.065(3) for failure to pay prevailing wages, and $54,000 for improperly filing certified payroll records. AR at 29. The NOV also noted that if Penhall was found to have violated the "Public Works Act" by failing to pay the required prevailing rate of wage, it would have a strike toward debarment under RCW 39.12.065(3), and if it were found to have filed false documents it would have a strike toward debarment under RCW 39.12.050(1).

C. Procedural Background

*Appeal to Office of Administrative Hearings*

Penhall appealed the NOV. The appeal was assigned to an administrative law judge (ALJ) from the office of administrative hearings (OAH), who held a nine-day evidentiary hearing. At the hearing, Penhall conceded that the work performed by the employees in question was pursuant to a public works contract but argued the workers in question were not covered by the PWA because they were "technicians" and not laborers, mechanics, or workers. In the alternative, Penhall argued even if the workers in question

were covered by the PWA, L&I incorrectly classified the workers under the scope of work for construction site surveyors.

L&I's primary witness was Jim Christensen who issued the NOV. In his testimony regarding the application of the scope of work, Christensen testified that L&I first determines whether prevailing wages apply and thereafter determines which scope of work applies. Christensen acknowledged that

> [t]here is no scope of work description that [L&I] throw[s] work into when [it] can't seem to make a decision. . . . [L&I] find[s] the reference in a . . . scope that seems to describe the work better than all the other passages in all the other scopes, and that's where [L&I] place[s] the work.

AR at 9468.

Christensen indicated that in determining which scope of work applies, he considers the nature of the work, which he opined included four factors: tools used, methods followed, materials applied, and the purpose of the work. On cross-examination, Christensen agreed that in undertaking a prevailing wage analysis L&I considers the tools used—including the historical use of the tool as well as the current use of the tool. It also considers the materials, methods, or processes used, location of the work performed, industry practice, and in some cases the unions claims for the work in question. However, Christensen did not agree that a site visit was necessary to assist L&I's scope of work determination. Christensen did not point to a rule or other L&I publication memorializing any of the factors he outlined in his testimony.

Ultimately, Christensen testified that he issued the NOV because he agreed with the determination that the GPR analysts and x-ray technicians in question performed construction site surveyor work because that scope of work was the best fit of all of the scopes of work, insofar as it spoke of using tools and electronic measuring devices to establish locations and elevations.

Penhall called Peter Brands to testify regarding the tools and duties of a surveyor. At the time of his testimony, Brands worked for Pacific Surveying and Engineering, a professional company that performs land surveying, civil engineering, and environmental studies work. Brands testified and demonstrated various surveying tools he used as part of his occupation as a land surveyor, including but not limited to a smart level, conventional level, metal detector, theodolite, a total station—which uses lasers to measure distance, and a bipod—which also uses lasers to measure distance. Brands testified that he had never used a GPR device for surveying.

The parties submitted post-hearing briefs in lieu of oral closing arguments.

After the hearing, the ALJ issued his initial order that included findings of fact and conclusions of law. He concluded that L&I had met its burden of proof that the prevailing wage applied to the work performed by GPR analysts and x-ray technicians and Penhall failed to pay prevailing wages, including overtime wages, to the 37 employees under RCW 39.12.065 and RCW 39.12.010(1). However, the ALJ disagreed that the construction site surveyor scope of work under WAC 296-127-01396 applied and

instead agreed with Penhall and modified the NOV to reflect that the laborer scope of work under WAC 296-127-01344 applied.

The ALJ also found that Penhall filed false pay records in violation of RCW 39.12.050 and WAC 296-127-320. However, the ALJ found Penhall's prevailing wage and false filing violations were inadvertent. The ALJ recognized that the civil penalties under RCW 39.12.065 and .050 do not apply to inadvertent violations and memorialized the same in conclusions of law 5.29 and 5.35 as well as his initial order. The ALJ remanded the matter to L&I, "for calculation, based upon the escalated prevailing wage rate for Laborers, with credit for 'fringe benefits,' and accounting for overtime owing for hours exceeding 8 per day." AR at 270.

*Appeal to the director*

The Department appealed to the director of L&I. Penhall did not cross appeal. The director affirmed the ALJ's initial order in part and reversed in part. The director reversed the initial order's conclusion that GPR analysts and x-ray technicians should be classified as laborers, finding instead that the language of WAC 296-127-01396 was not ambiguous, and based on the plain language of the regulation, the workers in question were construction site surveyors. He reasoned this was because, in pertinent part, they used the Mini XT and x-ray devices which the director found were electronic measuring devices used to measure depth. The director also found the list of tools listed in WAC 296-127-01396 was a series of tools connected by an "or" at the end of a list.

The director adopted that portion of the ALJ's initial order finding Penhall's violations for false filing and failing to pay prevailing wages inadvertent, but imposed a strike toward debarment pursuant to RCW 39.12.065 for its failure to pay prevailing wages.

### *Appeal to this court*

Penhall appealed the director's order to superior court. The parties agreed to transfer the appeal for direct review to this court pursuant to RCW 34.05.518.

### ANALYSIS

In prevailing wage violation hearings, "[L&I] shall have the burden of proving, by a preponderance of the evidence, that the violations occurred and that any wages were unpaid as stated in the notice." WAC 296-127-170(1). Where, as here, review of a final decision by the director of a department is at issue, the Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs review. *Silverstreak, Inc. v. Dep't of Lab. & Indust.*, 159 Wn.2d 879, 154 P.3d 891 (2007). A court shall grant relief from an agency order entered at an adjudicative proceeding only if the court determines that certain factors exist. RCW 34.05.570(3). Relevant to this case, Penhall contends that the director's decision "erroneously interpreted or applied the law," was "not supported by [substantial] evidence," was "inconsistent with a rule of the agency," or was "arbitrary or capricious." RCW 34.05.570(3)(d), (e), (h), (i). We sit in the same position as the

administrative tribunal and "appl[y] the WAPA standards directly to the record considered by the agency." *Silverstreak*, 159 Wn.2d at 879.

1.   FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

As an initial matter, L&I contends that several of Penhall's argument are waived because Penhall did not exhaust its administrative remedies. When an administrative hearing is presided over by an ALJ, the ALJ's proposed decision shall be served on the parties who then have 30 days to appeal the decision to the director. WAC 296-127-170(5). "If none of the parties appeals within thirty days, the proposed decision may not be appealed either to the director or the courts." *Id*. Any "notice of appeal [filed with the director] must specify which findings and conclusions are erroneous." WAC 296-127-170(6). On appeal, the director shall issue a final decision that affirms, modifies, or reverses the ALJ's proposed decision. WAC 296-127-170(7). A party aggrieved by the director's final decision may appeal "unless the final decision affirms an unappealed proposed decision." WAC 296-127-170(8).

Here, Penhall did not appeal the ALJ's initial order. Yet, in its response to L&I's appeal to the director, Penhall disputed several adverse rulings made by the ALJ. The director concluded that Penhall's challenges to adverse rulings within the initial order were foreclosed:

> The Initial Order concluded that "[b]ased on the foregoing and the findings of fact herein, the Department has met its burden to establish that the work

at issue is covered under RCW 39.12, and that prevailing wages are owing." Initial Order Conclusion of Law No. 5.13. This conclusion, as well as other adverse conclusions to Penhall cannot be disputed now by Penhall and is adopted. This means, among other things, that Penhall cannot contest that there is covered work under RCW 39.12; the import of the PLA [project labor agreement]; the wage calculations, including overtime and benefits; and the determination that there was a failure to pay prevailing wages and file certified payroll records. Accordingly, the Director adopts Initial Order Findings of Fact No. 4.10 to 4.14, and the Director adopts Initial Order Conclusions of Law No. 5.6, 5.13, 5.25 to 5.37 together with the Director's enumerated conclusions.

AR at 235.

To the extent that Penhall raises these same arguments on appeal to this court, we agree with the director that the issues are foreclosed by Penhall's failure to appeal from the initial order. By failing to appeal the ALJ's initial order, Penhall failed to exhaust its administrative remedies, precluding our review of these issues. *See Barson v. Dep't of Soc. & Health Servs.*, 58 Wn. App. 616, 619, 794 P.2d 538 (1990).

2. INTERPRETATION AND APPLICATION OF SCOPE OF WORK REGULATION

Penhall challenges the director's conclusion that L&I met its burden of proving that the work of GPR analysts and x-ray technicians should be classified as construction site surveyors under the PWA. Penhall's primary argument is that the director erroneously interpreted the scope of work. Penhall also challenges several of the director's findings of fact and the director's conclusion that the findings supported L&I's

classification of the work performed by GPR analysts and x-ray technicians as falling within the scope of work for construction site surveyors.

A. Interpretation of Construction Site Surveyor Scope of Work

The interpretation of a regulation is an issue of law this court reviews de novo. *Silverstreak*, 159 Wn.2d at 880; *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004). Our primary objective, in construing a statute, is to determine the interpretation that best reflects the legislature's intent. *Silverstreak*, 159 Wn.2d at 882.

The PWA is remedial legislation, designed to preserve local wages and protect employees from substandard earnings on public works projects. *Id*. As a result, "it is the worker, not the contractor, who is the intended beneficiary of the [act]." *Id.* at 880. Thus, the PWA "and regulations promulgated thereunder are to be liberally construed in favor of the beneficiary of the [PWA], the worker." *Id.* at 882. Where a court is called on to resolve a question of statutory construction, it should "'adopt the interpretation which best advances the legislative purpose.'" *Citizens All. for Prop. Rights Legal Fund v. San Juan County*, 184 Wn.2d 428, 437, 359 P.2d 753 (2015) (quoting *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990)), *cited with approval in Associated Gen. Contractors of Washington v. State*, 2 Wn.3d 846, 865, 544 P.3d 486 (2024).

"The '[r]ules of statutory construction apply to administrative . . . regulations.'" *D.W. Close Co. v. Dep't of Lab. & Indus.*, 143 Wn. App 118, 126, 177 P.3d 143 (2008)

(alteration in original) (quoting *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979)).

To determine the meaning of a regulation, we first look to its language and determine

whether it is clear on its face. *Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155

(2006). "'If an administrative rule or regulation is clear on its face, its meaning is to be

derived from the plain language of the provision alone.'" *D.W. Close Co*, 143 Wn. App.

at 126 (quoting *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002)).

"[W]hen we look at this plain language, we must read all words 'in the context of the

statute in which they appear, not in isolation or subject to all possible meanings found in

a dictionary.'" *Associated Gen. Contractors*, 2 Wn.3d at 855 (quoting *State v. Lilyblad*,

163 Wn.2d 1, 9, 177 P.3d 686 (2008)).

The scope of work for construction site surveyors under WAC 296-127-01396 is

defined as follows:

> For the purpose of the Washington state public works law,
> chapter 39.12 RCW, construction site surveyors perform survey work
> which requires the use or utilization of transits, tripod mounted levels,
> lasers, electrotape and other electronic measuring devices or theodolites to
> establish a location, an elevation or grade, distances, and other
> measurements.
>
> (1) The work of the construction site surveyor includes, but is not
> limited to:
>
> • Survey work performed after the contract is awarded and during
> the actual construction in direct support of construction crews when the
> worker is in the employ of and working under the direction of a
> construction contractor to survey check points of location and grade on a

construction site using a variety of measurement tools, instruments, and procedures.

(2) The construction site surveyor scope of work does not include surveying services not within the description in subsection (1) of this section that are required by specification or contract or state law to be performed under the direct supervision of individuals registered under chapter 18.43 RCW.

Both Penhall and L&I assert that WAC 296-127-01396 is not ambiguous. They implicitly agree that the plain language of WAC 296-127-01396 requires three primary elements be met for a worker to be a "construction site surveyor." The worker must (1) "perform survey work," (2) use certain enumerated tools, to (3) "establish a location, an elevation or grade, distances, and other measurements." However, the parties diverge on their construction and application of these provisions.

*Survey work*

While both parties agree that a construction site surveyor is one who performs "survey work," they disagree on the definition of survey work. Penhall asserts that all construction site surveyors under WAC 296-127-01396 are land surveyors as defined by chapter 18.43 RCW, and because the employees in question did not meet the requirements or perform the job duties under chapter 18.43 RCW, they necessarily were not construction site surveyors under WAC 296-127-01396. L&I responds that the undefined term "survey work" should be given its ordinary dictionary definition, which would encompass both traditional land surveyors and non-traditional survey work.

22

This court may determine the plain meaning of an undefined term from the dictionary. *State v. Barnes*, 189 Wn.2d 492, 496, 403 P.3d 72 (2017). However, "[i]f a term is defined in a statute, that definition is used." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992).

Determining the definition of terms in a rule or statute is a question of law. *See City of Redmond v. Central Puget Sound Growth Mgmt. Hr'gs Bd.,* 136 Wn.2d 38, 49, 959 P.2d 1091 (1998) (proper definition of a statutory term is a question of law). The dictionary definition of "survey" means "to determine and delineate the form, extent, and position of ([such] as a tract of land . . .) by taking linear and angular measurements and by applying the principles of geometry and trigonometry." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2302 (1993). Similar to the dictionary definition, the director concluded that "survey work is the establishing of a location, elevation, grade, distance, or other measurements." AR at 236. The director clarified that "[s]urvey work includes the understanding of geometry, mathematics and applying it to the earth," and includes "analysis and mental work." AR at 230.[6]

Penhall argues that the director committed an error of law in applying a dictionary definition because "survey work" is already defined in the separate but related chapter

---

[6] Although the director labeled these definitions as findings of fact, we review them as conclusions of law. *See City of Tacoma v. William Rogers Co.*, 148 Wn.2d 169, 181, 60 P.3d 79 (2002).

regulating professional land surveyors, chapter 18.43 RCW. Penhall contends that chapter 18.43 RCW should be read as a related statute for three reasons. First, WAC 296-127-01396 uses the term "survey work" and RCW 18.43.020 defines "professional land surveyor" and the "practice of land surveying." Second, the regulation uses a phrase similar to language used in chapter 18.43 RCW. And third, the scope of work explicitly references chapter 18.43 in its description of construction site surveyors. We conclude that chapter 18.43 RCW is not a related statute and was not intended to define the term "survey work" in WAC 296-127-01396.

The plain and ordinary meaning of a statute is generally derived from the "'context of the entire act'" and related statutes. *Barnes*, 189 Wn.2d at 495-96. A "related statute" can be one that is cross-referenced or incorporated into another statute by reference. *See State v. Weatherwax*, 188 Wn.2d 139, 149-51, 392 P.3d 1054 (2017).

Penhall first argues that the State of Washington has already defined what work is performed by a surveyor in chapter 18.43 RCW. Penhall suggests that "survey work" as set forth in WAC 296-127-01396 is synonymous with the "practice of land surveyor" under RCW 18.43.020(9) and that construction site surveyors under WAC 296-127-01396 are a subset of land surveyors as set forth in RCW 18.43.020(6). In essence, Penhall suggests that because RCW 18.43.020(11) contains a definition for "professional land surveyor" it must be a "related statute" to WAC 296-127-01396 and therefore provides context for the definition of "construction site surveyor" and "survey work" in

WAC 296-127-01396. Contrary to Penhall's implied assertion, just because a definition for the same or similar term exists in separate statutes or regulations, does not necessarily mean they are "related." *See Davis v. Dep't of Licensing*, 137 Wn.2d 957, 977 P.2d 554 (1999).

Here, both the chapter and the regulation explicitly limit their applications. WAC 296-127-01396 begins with the words, "[f]or the purpose of the Washington state public works law, chapter 39.12 RCW." The same limiting language appears in RCW 18.43.020, "[t]he definitions in this section *apply throughout this chapter* unless the context clearly requires otherwise." (emphasis added).

Next, Penhall argues that the scope of work regulation uses a phrase similar to language found in chapter 18.43 RCW. Penhall points out that a construction site surveyor is one who "survey[s] check points of location and grade on a construction site," which is language similar to the definition of the "[p]ractice of land surveying" in RCW 18.43.020(9). We agree with the director that the scope of work for a construction site surveyor describes work that is performed in traditional land surveying; we disagree with Penhall that the regulation is limited to this type of surveying. Instead, the plain language indicates that:

> [t]he work of the construction site surveyor includes, but is not limited to:
>
> • Survey work performed after the contract is awarded and during the actual construction in direct support of construction crews when the worker is in the employ of and working under the direction of a construction contractor

> to survey check points of location and grade on a construction site using a
> variety of measurement tools, instruments, and procedures.

WAC 296-127-01396(1); *see State v. Joseph*, 3 Wn. App. 2d 365, 372, 416 P.3d 738

(2018) (statutory language, "including but not limited to" demonstrates a legislative

intent to create an illustrative, not exhaustive list.).

Finally, Penhall argues that the explicit reference to chapter 18.43 RCW in WAC

296-127-01396(2) demonstrates an intention to incorporate the definitions in this chapter

as a related statute. A "related statute" can be one that is cross-referenced or incorporated

into another statute by reference. *See Weatherwax*, 188 Wn.2d at 149. Penhall is correct

that WAC 296-127-01396 does reference chapter 18.43 RCW in subsection (2), which

states:

> The construction site surveyor scope of work does not include surveying
> services not within the description in subsection (1) of this section that are
> required by specification or contract or state law to be performed under the
> direct supervision of individuals registered under chapter 18.43 RCW.

However, when read together with subsection (1), the scope of work both includes

and excludes certain survey work. Generally speaking, under subsection (1), survey

work performed during construction by someone employed by a contractor to perform

traditional survey work such as "survey check points of location and grade on a

construction site using a variety of measurement tools, instruments, and procedures" is

included within the scope of a construction site surveyor. Under subsection (2), survey

work is excluded if it does not fall within the example of subsection (1) and is required to be performed under the supervision of a land surveyor registered under chapter 18.43 RCW. While subsections (1) and (2) provide that certain traditional survey work will either be included or excluded, the language does not constrain survey work to work defined in chapter 18.43 RCW.

We hold that chapter 18.43 RCW is not a related chapter for purposes of discerning the meaning of "survey work" or "construction site surveyor" in WAC 296-127-01396 The language used by the promulgators of both chapter 18.43 RCW and WAC 296-127-01396 indicates the definitions set forth in each are intended to be confined to the statute and regulation in which they appear. The language in WAC 296-127-01396(1) makes it apparent that construction site surveyor work under the regulation "includes, but is not limited to," survey check points. And, although there is a cross-reference to chapter 18.43 RCW in WAC 296-127-01396(2), that reference works to exclude certain survey work.

We conclude that the director did not err in applying the dictionary definition, or a modified version of the dictionary definition to the term "survey work." The definition applied by the director is more expansive than the definition promoted by Penhall and thus promotes the purpose of the PWA.

*Survey tools*

Penhall contends that the director committed an error of law in his interpretation of the required list of tools used by construction site surveyors in WAC 296-127-01396. The parties agree that under WAC 296-127-01396, construction site surveyors must perform survey work that "requires the use or utilization of transits, tripod mounted levels, lasers, electrotape and other electronic measuring devices or theodolites." However, their interpretation of this list of tools differs.

Penhall argues that the tools listed must be limited to survey tools, or devices a land surveyor would use in the performance of their work. It argues that any other interpretation would lead to non-sensical results. Penhall further argues that the list of tools is divided into two categories connected by the conjunction "and." Under this interpretation, construction site surveyors must use at least one tool from each of the two categories, i.e., [part 1] transits, tripod mounted levels, lasers, electrotape and [part 2] other electronic measuring devices or theodolites.

The director disagreed and concluded that "[t]he plain language of the introductory sentence reflects an intent to list a *series* of tools. To that end, there is an omitted comma before 'theodolites,' but this omission is not dispositive when reading the provision as a whole." AR at 238. L&I defends the director's conclusion, asserting that the last antecedent rule makes it clear the list is intended as a series.

We disagree with L&I that the last antecedent rule applies, but we agree that the list of tools is a single integrated list. The tools here are most logically read as a series of tools that can be used to perform survey work. This reading is consistent with the series-qualifier rule as well as the directive that we read the regulations of the PWA broadly.

Traditional rules of grammar are used to discern the plain language of a statute. *State v. Valdiglesias LaValle*, 2 Wn.3d 310, 318, 535 P.3d 856 (2023). The last antecedent rule is one such grammar rule. It establishes that "qualifying or modifying words and phrases refer to the last antecedent." *State v. Bunker*, 169 Wn.2d 571, 578, 238 P.3d 487 (2010). Punctuation can play a part in how the last antecedent is interpreted. More specifically, "'the presence of a comma before the qualifying phrase is evidence the qualifier is intended to apply to all antecedents instead of only the immediately preceding one.'" *Id.* (quoting *City of Spokane v. County of Spokane*, 158 Wn.2d 661, 673, 146 P.3d 893 (2006)) (internal quotation marks omitted).

In the present case, WAC 296-127-01396 contains the qualifying or modifying phrase "to establish a location, an elevation or grade, distances, and other measurements." The phrase is not preceded by a comma. Thus, the typical construction would have the modifying phrase apply only to theodolites, the last antecedent. Construing the list as one series as L&I suggests versus two parts as recommended by Penhall does not change the application of this rule, and therefore it is not helpful in discerning the construction of the list. However, we need not apply the last antecedent rule where it does not make sense to

do so. *PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue*, 196 Wn.2d 1, 10, 468 P.3d 1056 (2020); *Bunker*, 169 Wn.2d at 578; *State v. McGee*, 122 Wn.2d 783, 864 P.2d 912 (1993).

The "series-qualifier" rule of grammar creates the presumption that "'when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.'" *PeaceHealth St. Joseph Medical Center v. Dep't of Revenue*, 9 Wn. App. 2d at 781 (quoting BLACK'S LAW DICTIONARY 1574 (10th ed. 2014)) *aff'd*, 196 Wn.2d 1 (2020). The "rule applies when two textual signals are present: first, when the modifying phrase makes sense with all items in the series; and second, when the modifying clause appears at the end of a single, integrated list." *Id*. Here, the modifier makes sense when we apply it to each tool in the series, and this supports that the second element is met; the list is a single, integrated list.

Again, WAC 296-127-01396 states in pertinent part that "construction site surveyors perform survey work which requires the use or utilization of transits, tripod mounted levels, lasers, electrotape and other electronic measuring devices or theodolites to establish a location, an elevation or grade, distances, and other measurements." Both parties agree that the modifier "to establish a location, an elevation or grade, distances, and other measurements" applies to all the listed tools. For the series-qualifier rule to apply, however, all the listed items must be a part of a single, integrated list.

Penhall's interpretation fails for several reasons. First, Penhall's suggestion, that the list contains two parts, runs afoul of its argument that the modifier applies to all the listed tools such that the series-qualifier rule applies. Here, the most logical interpretation of the sentence is that the listed tools are a single integrated list modified by the clause that comes immediately thereafter. Second, Penhall's split categories interpretation would lead to absurd results. A surveyor using only a theodolite would not qualify as a construction site surveyor. Nor would a surveyor using only a transit.

Finally, Penhall argues that reading the list of tools as an integrated list would render the definition of construction site surveyors so broad that any worker using an electronic tape measure would now fall under the scope of work. We disagree. The use of tools within the scope is constrained by its purpose: to conduct survey work for a particular purpose.

We conclude that WAC 296-127-01396 is not ambiguous. The plain language of the regulation, liberally construed in favor of the workers, provides that a construction site surveyor is someone who conducts "survey" work—which is work that "determine[s] and delineate[s] the form, extent, and position of ([such] as a tract of land . . .) by taking linear and angular measurements and by applying the principles of geometry and

trigonometry"[7]—by using at least one of the enumerated tools for the purpose of establishing a location, an elevation or grade, distances, and other measurements.

Because we conclude that WAC 296-127-01396 is not ambiguous, we do not address Penhall's arguments related to the interpretation of an ambiguous regulation.

B. Challenged Findings of Fact

Penhall argues the director's findings supplanting those of the ALJ were not supported by substantial evidence, entitling it to relief under RCW 34.05.570(3)(e). Penhall asserts that this action was also arbitrary and capricious and does not pass the gimlet eye test set forth in *Crosswhite*[8] because the director disregarded, without justification, the findings of the ALJ that were supported by substantial evidence. L&I responds that the director explained extensively his reasons for adopting, modifying, or omitting the findings in the initial order. L&I also notes that "while Penhall assigns error to many findings of fact . . . it presents little argument why specific findings are incorrect." Resp't's Br. at 16. L&I suggests that this court therefore treat the challenged findings as verities since Penhall failed to present argument on the same.

---

[7] *Webster's, supra*, at 2302.
[8] *Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 560, 389 P.3d 731.

We decline to review Penhall's challenges to the director's findings because the challenges were not sufficiently developed in the briefing or are otherwise not relevant given our preceding interpretation of the scope of work.

In its briefing, Penhall assigns error to over 30 findings of fact, asserting the director erred by entering, modifying, or deleting the same. Penhall then sets forth under its "Issues Pertaining to Assignments of Errors" section, a blanket assertion that the challenged findings of fact are not supported by substantial evidence pursuant to RCW 34.05.570(3)(e). It then buries many of its substantive arguments regarding substantial evidence throughout its brief, in both the body, as well as in a series of footnotes instead of a dedicated section. *See, e.g.*, Appellant's Br. at 37 n.11, 43 & n.13, 44, 46 n.14, 53, 64 n.37, 67. Further, with a few exceptions, the typical "argument" set forth is a one-line conclusory statement that the finding in question "is not supported by substantial evidence." *See, e.g.*, Appellant's Br. at 37 n.11 (Asserting that "[t]he Director's Order is not supported by substantial evidence," without further support.). We decline to address challenges to findings that are not supported by analysis. Under RAP 10.3(g), a party should assign error to each finding of fact a party contends was improperly made. The arguments in support of issues and assignments of error should be made in the argument section, not the statement of the case. RAP 10.3(a)(5), (6). In addition, a party "challenging findings of fact must present argument as to why the specific findings are

unsupported and cite to the record to support that argument." *In re Disciplinary Proceeding Against Abele*, 184 Wn.2d 1, 13, 358 P.3d 371 (2015).

"Passing treatment of an issue, lack of reasoned argument, or conclusory arguments without citation to authority are not sufficient to merit judicial consideration." *In re Vulnerable Adult Pet. For Winter*, 12 Wn. App. 2d 815, 835, 460 P.3d 667 (2020). Where claims are unsupported by meaningful analysis, this court will not consider them and will instead deem such claims waived. *See* RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809. Our courts have also held that "'placing [a substantial evidence argument] in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal.'" *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 497, 254 P.3d 835 (2011) (internal quotation marks omitted) (quoting *St. Joseph*, 158 Wn. App. at 473). And where "'[a]n issue [is] raised and argued for the first time in a reply brief,'" it is considered "'too late to warrant consideration.'" *Norcon Builders, LLC*, 161 Wn. App. at 497 (alteration in original) (quoting *Cowiche Canyon*, 118 Wn.2d at 809).

We note that many of Penhall's challenges to the director's findings are not relevant in light of our interpretation of the construction site surveyor scope of work. For example, Penhall challenges the director's decision to delete the ALJ's finding that surveyors warrant their work. But this finding is only relevant if survey work or construction site surveyors are limited to land surveying under chapter 18.43 RCW.

Similarly, the director's finding that GPR analysts and x-ray technicians used lasers to measure is of consequence to Penhall only if this court were to omit the requirement that construction site surveyors also undertake survey work. The director's deletion of the ALJ's finding that GPR analysis and x-ray technicians do not use survey tools is also irrelevant. Instead, based on our conclusion above, the relevant question is whether GPR analysts and x-ray technicians perform survey work by using at least one of the tools listed for an enumerated purpose. Finally, the director's reliance on the generalized testimony of Christensen was only relevant if the scope of work was deemed ambiguous.

Penhall argues, in a footnote, that the director's deletion of the finding that the "Industrial Statistician was not aware that [L&I] failed to consider Industry Practice when he signed the NOV" was not supported by substantial evidence. Appellant's Br. at 64 n.37. However, as the director noted, the industrial statistician's awareness of whether or not industry practice was considered prior to the issuance of an NOV is not relevant. Industry practice is not an element to be considered in the issuance of an NOV, nor an element to be proved as part of a subsequent challenge of the same. *See* WAC 296-127-170. Additionally, while industry practice may be a relevant consideration in construing an ambiguous regulation, or where the validity of the regulation is challenged, it is not relevant when the regulation is unambiguous, as is the case here. *See, e.g.*, *D.W. Close Co.*, 143 Wn. App. at 130-33 (considering WAC 296-127-013 as part of a challenge to

the validity of a scope of work but elsewhere noting that an unambiguous rule or regulation's meaning is derived from the plain language of the provision alone).

Finally, in its statement of the case, Penhall includes a passing comment that "[t]he analysis of the hyperbola involves no mathematical calculations by the GPR Analyst." Appellant's Br. at 8. Penhall does not pair this with any argument or request for relief under RCW 34.05.570. L&I responded that Penhall failed to adequately brief the issue, and the director's finding was supported by substantial evidence. In its reply brief, Penhall develops its argument on why the finding is not supported by substantial evidence. We decline to address arguments developed in the reply brief. *Norcon Builders, LLC*, 161 Wn. App. at 497.

Because we find that the challenges to the director's findings to be irrelevant, surplusage or waived, we decline to address Penhall's argument that the director's findings were arbitrary and capricious.

### C. Application of Construction Site Surveyor Scope of Work to GPR Analysts and X-ray technicians

Whether the agency correctly applied the law to its factual findings is a question of law reviewed de novo. *Silverstreak*, 159 Wn.2d at 880.

While Penhall challenges the director's application of the findings to scope of work, it does so only in the context of its proffered interpretation of a construction site surveyor. In other words, while Penhall contends that the director erred in his

application, it bases this argument on Penhall's asserted definition of a construction site surveyor. Penhall does not argue in the alternative that even if the director's interpretation was correct, the director still misapplied the facts to the law. Regardless, we conclude that the director did not commit an error of law in applying the law to the facts.

As set forth above, WAC 296-127-01396 requires GPR analysts and x-ray technicians to (1) perform survey work (2) using at least one of the listed tools (3) to establish a location, an elevation or grade, distances and other measurements.

### (i) Survey work performed

As noted above, the dictionary definition of "survey" means "to determine and delineate the form, extent, and position of ([such] as a tract of land . . .) by taking linear and angular measurements and by applying the principles of geometry and trigonometry." WEBSTER'S, *supra*, at 2302.

The director concluded GPR analysts and x-ray technicians performed survey work. Specifically, he concluded:

> The GPR analysts and x-ray technicians look for locations as a point that has distinguishing features, elevations in the vertical plane in a three-dimensional space, distances between points, and other measurements such as depth. The work here involved examining an area on the site of a public works project; performing mathematical and geometric calculations using the hyperbola and parabola; using results in geometrical renderings; taking linear measurements; delineating the location, elevation, distance, and depth of existing features; and calibrating the dimensioning of objects buried in

37

concrete, as well as using computerized three dimensional readings. This is
survey work that satisfies the construction site surveyor scope of work.

AR at 237.

Penhall challenges the definition of "survey work" but does not otherwise make a

meaningful challenge to the director's application of the definition to the director's

findings concerning the nature of the work. The director did not err in concluding that

the work performed by GPR analysts and x-ray technicians fell within the definition of

survey work.

*(ii) Survey tools: other electronic measuring devices*

As set forth above, WAC 296-127-01396 requires the use of transits, tripod

mounted levels, lasers, electrotape and other electronic measuring devices or theodolites.

It is undisputed that the workers in question did not use transits, tripod mounted levels,

electrotape or theodolites, and the director so found. However, it is also undisputed that

the workers in question used Mini XT, x-ray emitters, and x-ray detectors. The director

found that these tools met the definition of electronic measurement tools.

Penhall does not dispute this application. Instead, it contends that use of a tool

defined as an electronic measuring device is not enough because the regulation creates

two categories of tools and a constructive site surveyor must use at least one tool from

each category. We reject that interpretation above.

The director did not err in concluding that Mini XT and x-ray devices are "other electronic measuring devices" as required by WAC 296-127-01396.

### (iii) Purpose of using survey tools

Construction site surveyors must perform survey work using one of the enumerated tools for a particular purpose: to establish a location, an elevation or grade, distances, and other measurements. WAC 296-127-01396. The director concluded that GPR analysts and x-ray technicians used tools to establish location, elevation, distance, and other measurements such as depth. Penhall challenges the conclusion that GPR analysts and x-ray technicians were using other electronic measuring devices to establish location and other measurements. It does not meaningfully challenge the director's conclusion that the tools were used to determine elevation and distance.[9]

WAC 296-127-01396 can be satisfied by demonstrating that the worker in question used one of the enumerated tools to establish a location. The director concluded that "GPR analysts and x-ray technicians look for locations as a point that has distinguishing features." AR at 237. Penhall argues that the location of buried objects is not equivalent to the establishment of locations that a land surveyor undertakes.

---

[9] Penhall assigns error to the director's additional findings and conclusions that GPR analysts and x-ray technicians determined elevation and distance, but does not otherwise develop this argument.

39

"Establish" is defined in relevant part as "to make firm or stable." WEBSTER'S, *supra*, at 778. Penhall implicitly argues that the WAC's requirement that the tools be used to establish *a* location is different than establishing *the* location of something. Penhall uses the example of a land surveyor to highlight the distinction. But this court is confined to the plain language of the regulation and must interpret it broadly. *Silverstreak*, 159 Wn.2d at 882-83; *Glacier Nw., Inc. v. Dep't of Lab. & Indus.*, 32 Wn. App. 2d 189, 197-98, 555 P.3d 896 (2024). The dictionary provides one definition of "a" as meaning "any." WEBSTER'S, *supra*, at 1. Thus, the question is whether GPR analysts or x-ray technicians used their electronic devices to "make firm or stable" "any location." They did. The GPR and x-ray devices in question were undisputedly used to establish the location of subsurface embedments.

Penhall also challenges the director's conclusion that the workers used tools to determine other measurements such as depth. Penhall contends that such a conclusion necessarily adds the word "depth" to the regulation contrary to the plain language.

The establishment of "other measurements" using one of the enumerated tools is one means of satisfying WAC 296-127-01396. Contrary to Penhall's assertion, "depth" is included in the plain language of the WAC because it is a *type* of measurement. WEBSTER'S, *supra*, at 607 (defining "depth" as "the perpendicular *measurement* downward from a surface.") (emphasis added).

X-ray technicians and GPR analysts used electronic measuring devices to establish the depth and other measurements of embedments. At the hearing, Garcia testified that he used the numbers on the screen of the Mini XT to determine how deep certain embedments were as well as establishing distances. Renati, who also worked as a GPR and x-ray technician and later marketed those technologies for Penhall, testified that an x-ray scan could not give the depth of objects but could measure the distance. The depth of objects depicted in an x-ray image was determined by the x-ray technician using a GPR device. Thus, GPR analysts and x-ray technicians both used electronic measuring devices to establish measurements such as distance and depth.

D. Investigation and Witnesses

Penhall argues that L&I's investigation is inconsistent with agency rules and the director's order in favor of L&I was arbitrary and capricious under RCW 34.05.570(3)(h), (i). Specifically, Penhall argues that the investigation underlying the NOV was inconsistent with agency rules and was arbitrary and capricious because L&I did not undertake a sufficient investigation to determine the appropriate classification of the Penhall employees in question. Penhall also asserts that L&I failed to conduct a site visit, observe the work being performed, or interview Penhall management to describe the work being performed prior to its issuance of the NOV. Additionally, Penhall raises challenges to the evidence produced during the administrative hearing, challenging L&I's failure to call certain witnesses involved in investigating the complaint against Penhall.

41

With respect to the director's order, Penhall argues that it is arbitrary and capricious because it failed to apply the missing witness doctrine. These arguments fail for several reasons.

First, other than claiming that the director's order was arbitrary and capricious, Penhall does not identify the basis for its challenges under RCW 34.05.570. A party is entitled to relief if it can identify and demonstrate invalidity of an agency action on one of the bases listed in RCW 34.05.570 and prejudice flowing therefrom. RCW 34.05.510, .570.

Furthermore, while L&I carries the burden of proving a violation by a preponderance of the evidence, WAC 296-127-170(1), Penhall fails to identify a rule or regulation that required L&I to follow a certain procedure during the investigation and trial. Instead, the quality of L&I's investigation and the witnesses L&I calls to testify go to the credibility and sufficiency of its evidence and its ability to meet its burden of proof. We do not address questions of credibility on appeal, and we have already determined that L&I's evidence is sufficient to support the conclusion that the work of GPR analysts and x-ray technicians was properly classified under the construction site survey scope of work. *See Mercier v. Dep't of Lab. & Indus.*, 35 Wn. App. 2d 780, 581 P.3d 655 (2025) (appellate courts do not reevaluate credibility on appeal).

Penhall also contends that it was entitled to a missing witness presumption because L&I failed to present the testimony of some L&I employees involved in L&I's

investigation. The missing witness rule provides that "'where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so,—the jury may draw an inference that it would be unfavorable to him.'" *State v. Abdulle*, 174 Wn.2d 411, 417, 275 P.3d 1113 (2012) (internal quotation marks omitted) (quoting *State v. Davis*, 73 Wn.2d 271, 276, 438 P.2d 185 (1968)).

Penhall's argument fails for two reasons. First, Penhall fails to show that the witnesses who did not testify were material. Jim Christensen was L&I's top manager on prevailing wage matters at the time of the NOV and thus L&I argues Christensen was the most appropriate witness to testify regarding the classification of the workers in question. RCW 39.12.015; RCW 43.22.260 to .270.

Second, the missing witness doctrine is permissive not mandatory. It allows—but does not require—the fact finder to draw an unfavorable inference against the party failing to call a material witness. *Abdulle*, 174 Wn.2d at 417. Thus, even if Penhall could show that the prerequisites were met, it was not entitled to a particular presumption.

3. WAGE AND BENEFIT CALCULATIONS

Penhall advances several challenges to L&I's calculations of wages owed. L&I asserts that Penhall waived these arguments by failing to appeal the ALJ's initial order. We agree with L&I.

Penhall contends that the director's order is inconsistent with a Department rule but points only to L&I's burden under WAC 296-127-170(1) to prove that wages were unpaid as stated in the notice. The director concluded that Penhall owed the wages and interest listed in the NOV. On appeal to this court, Penhall contends that the summary evidence admitted under ER 1006 and used to support the NOV and the director's conclusion is unreliable because the source documents were not introduced. Although Penhall characterizes the argument as one of sufficiency, it is really raising an evidentiary challenge. This argument fails for two reasons.

First, Penhall fails to articulate the basis for this challenge on appeal under RCW 34.05.570. Second, as L&I points out, Penhall's argument, that the summary evidence is unreliable because the source data was not introduced, is contrary to the record.

Next, Penhall argues that the director acted arbitrarily and capriciously when it overturned the ALJ's initial order, which found that L&I failed to properly account for calculations regarding overtime or benefits paid by Penhall. Related to their allegation of an overtime error, Penhall also interjects that "to the extent it applies, the Sound Transit PLA permits an employer to elect to have a four, tens schedule." Appellant's Br. at 98. However, as L&I points out, Penhall is mistaken.

Penhall's assertion that the initial order found that L&I failed to properly account for benefits or overtime is factually incorrect. The initial order found that the Penhall employees in question should have been classified as laborers and paid the prevailing

wage for the classification of laborers instead of construction site surveyors. Because the original NOV calculations were based on the construction site surveyor rate of wage, the initial order remanded the matter to L&I for further calculations based on the laborer rate. The ALJ did not find any error in L&I's accounting for benefits or overtime, including the four, tens overtime calculations. Thus, contrary to Penhall's assertion, there was no such ruling for the director to overturn.

As to Penhall's assertion that it was not required to pay overtime on anything over 8 hours per day because the Sound Transit PLA permits a four, tens schedule, this assertion is misleading. The ALJ's initial order, incorporated by reference into the director's order, noted that Penhall was not entitled to the benefit of the PLA's four, tens schedule because Penhall failed to fulfill the PLA's notice requirement[10] prior to exercising this option. Penhall provides no citation to the record to refute this finding.

Penhall's allegation that it did not receive adequate credit for fringe benefits is similarly misplaced. Penhall provided L&I with the numbers underlying L&I's calculations for fringe benefits. L&I's audit provided a credit of $2.43 per hour for fringe benefits based on the documents provided by Penhall. The ALJ's initial order found that fringe benefits were provided in the same amount, $2.43 an hour. No other testimony

---

[10] The PLA stated, "[p]rior to changing a shift from 5x8 hours to 4x10 hours, a contractor must give at least five (5) calendar days advance notice to the employees." AR at 3049.

was introduced at the hearing that controverted this calculation. The director's order did not overturn—arbitrarily, capriciously, or otherwise—any findings in the initial order related to L&I's accounting for fringe benefits or overtime.

Next, Penhall asserts that its own expert conducted a review of L&I's audit and opined that only $150,202.48 was owed. Penhall asserts that the director's order failed to address these calculations. But the director did not consider Penhall's figure in his order because it was based on a finding that the work was covered under the laborer's scope of work. The figure is irrelevant because the director found the workers in question were construction site surveyors and not laborers.

4. STRIKE TOWARD DEBARMENT

Penhall next challenges the director's imposition of a strike. It raises two bases for relief on this contention. First, Penhall argues that the director's action was arbitrary and capricious where he overturned the initial order's determination that Penhall's false filing was inadvertent. Second, Penhall argues because its violation was inadvertent, it should not be subject to a strike toward debarment under RCW 39.12.050 and the director's order affirming a strike toward debarment was therefore an error of law. L&I concedes that "[t]he Director's Order includes an unnecessary conclusion that Penhall is subject to a strike toward debarment under RCW 39.12.065" but argues that the matter is not ripe for review because Penhall is not yet subject to the contemplated debarment.

Resp't's Br. at 67. Thus, L&I asserts that this court should not consider the issue until there is a second violation, if any.

We agree with Penhall that the director committed an error of law when it imposed a strike where Penhall's offense was inadvertent.

A. Ripeness and Redressability

We first address L&I's argument that Penhall's challenge is neither redressable or ripe. L&I argues this issue is not redressable or ripe because Penhall is not yet subject to debarment and the APA requires more than speculative redressability. Thus, L&I argues this court should not consider this issue until there is a second violation, if any. Penhall responds that the strike against debarment is an actual penalty ripe for adjudication because the strike can lead to a prohibition from bidding on public work.

A claim is ripe for judicial review if the challenged action is final, no further factual development is necessary, and the issues are primarily legal. *State v. Gantt*, 29 Wn. App. 2d 427, 456, 540 P.3d 845, *review denied*, 3 Wn.3d 1002, 549 P.3d 115 (2024). A speculative and hypothetical claim is not ripe for review. *Id.*

There is little question here that this issue is ripe for judicial review. Neither party disputes the challenged action is final, and no further factual development is necessary to determine the purely legal question of whether the director could impose a strike if Penhall's violation was found inadvertent.

L&I sets forth a one-line argument on redressability stating that "[t]he APA requires more than speculative redressability,"[11] and infers that because Penhall is not yet subject to the contemplated debarment, this court cannot provide relief since no harm has yet arisen. L&I cites *Benton County Water Conservancy Board v. Department of Ecology*, 3 Wn. 3d 59, 546 P.3d 394 (2024), but provides no analysis.

Typically, the party seeking review bears the burden to prove standing. *Sarepta Therapeutics, Inc. v. Wash. State Health Care Auth.*, 19 Wn. App. 2d 538, 549, 497 P.3d 454 (2021). We review issues of standing de novo. *In re Estate of Becker*, 177 Wn.2d 242, 246, 298 P.3d 720 (2013).

The PWA regulates employers, such as Penhall. Under RCW 39.12.065(3), Penhall as the offending party, is subject to a strike. Penhall is not asserting the rights of some third party, as was the case in *Benton County Water Conservancy*, 3 Wn.3d 59.

L&I suggests that Penhall can seek relief if and when a second strike is imposed since that is when debarment would be imposed. That argument is curious since Penhall would be unable at the time of the imposition of a second strike to reach back to challenge the imposition of this strike and there is no assurance that Penhall would have grounds to challenge a subsequent strike, whereas it has grounds to challenge the present strike.

---

[11] Resp't's Br. at 67.

While it is true that Penhall is not subject to debarment presently, it has been harmed insofar as it has presently been penalized with a strike toward this debarment. The director's order reads, "[h]aving violated former RCW 39.12.065, Penhall *has* a strike toward debarment." AR at 247 (emphasis added). Penhall only gets one "free" strike before debarment. At present, it has lost that strike.

B. Inadvertence

Having determined that Penhall's challenge to the director's imposition of a strike is both ripe and redressable, we turn to Penhall's contentions.

Inadvertence is a defense against a strike toward debarment. RCW 39.12.065(3). Penhall's argument is that the director committed an error of law when he subjected Penhall to a strike toward debarment where Penhall's violation was inadvertent. Whether the director correctly applied the law to the facts as found by the agency is a question of law we review de novo. *Glacier*, 32 Wn. App. 2d at 195.

Under RCW 39.12.065(3), L&I may impose sanctions, including strikes toward debarment. However, "the civil penalty and sanctions . . . do not apply to a violation determined by the director to be an inadvertent filing or reporting error." *Id.*[12] RCW 39.12.010(5) sets forth that

> [a]n 'inadvertent filing or reporting error' is a mistake and is made notwithstanding the use of due care by the contractor, subcontractor, or

---

[12] RCW 39.12.065 was amended in 2019 and 2023, but this language remained unchanged.

employer. An inadvertent filing or reporting error includes a contractor who, in good faith, relies on a written determination provided by the department of labor and industries and pays its workers, laborers, and mechanics accordingly, but is later found to have not paid the proper prevailing wage rate.

The original NOV assessed $100,351.74 civil monetary penalty for failing to pay prevailing wages and a $54,000.00 civil monetary penalty for an alleged certified payroll records violation. It also asserted that in the event Penhall was found to have failed to pay the required prevailing rate of wage or filing false documents, it would have a "strike" toward debarment under RCW 39.12.065(3) and .050(1) respectively. The initial order determined that Penhall's failure to pay prevailing wages and file certified payroll records was inadvertent. Accordingly, the initial order found Penhall was not liable for civil monetary penalties under RCW 39.12.065 and/or 39.12.050.

The director's order adopted the initial order's conclusions of law Nos. 5.6, 5.13, 5.25 to 5.37. Among the adopted conclusions of law, in addition to the finding that Penhall's failure to pay prevailing wages and file certified payroll records was inadvertent, was a finding that "[t]he civil penalty and sanctions under RCW 39.12.065 do not apply to a violation determined by the director to be an inadvertent filing or reporting error." AR at 53, 268. Notwithstanding this adoption, the director's order imposed a strike toward debarment under RCW 39.12.065. In doing so, the director erroneously applied the law.

Because the director adopted the finding that Penhall's false filing of documents and failure to pay prevailing wages and filing certified records was inadvertent, and the penalties and sanctions under RCW 39.12.065 do not apply to a violation determined by the director to be inadvertent, the director incorrectly applied the law to the facts as found by the agency. Penhall should not have received a strike toward debarment under RCW 39.12.065 for its inadvertent violation.

Where this court finds that a party has met its burden of proving an agency's action is invalid under the APA, a reviewing court may grant relief outlined in RCW 34.05.578(4). One option for relief is to set aside the agency's action. 34.05.570(1)(b). We therefore set aside that portion of the director's decision imposing a strike against Penhall under RCW 39.12.065.

5. CONSTITUTIONAL RIGHT TO A JURY TRIAL

Penhall contends that the administrative hearing in this case violated its right to a jury trial under article I, section 21. More specifically, Penhall argues that, similar to the Seventh Amendment to the United States Constitution, the right to a jury trial under article I, section 21 of the Washington Constitution should be read to require a jury trial anytime civil penalties go beyond restoring the status quo. Penhall argues *Security Exchange Commission v. Jarkesy*, 603 U.S. 109, 144 S. Ct. 2117, 219 L. Ed. 2d 650 (2024), is analogous to the present matter and supports its position. L&I responds that Penhall's argument is meritless and that the APA has allowed for judicial review of

51

agency orders without a jury trial for decades under RCW 34.05.510(3) and the Seventh

Amendment does not apply to state civil cases. We decline to reach the merits of this

issue because it has not been sufficiently briefed by the parties.

Whether there is a right to a jury trial in cases brought under Washington's PWA

appears to be an issue of first impression. Article I, section 21, guarantees that "[t]he

right of trial by jury shall remain inviolate." The Seventh Amendment to the United

States Constitution, which also affords a right to a jury trial in some civil cases, does not

apply to the states through the Fourteenth Amendment. *Sofie v. Fibreboard Corp.*, 112

Wn.2d 636, 644, 771 P.2d 711 (1989); *Minneapolis & St. Louis R.R. Co. v. Bombolis*,

241 U.S. 211, 36 S. Ct. 595, 60 L. Ed. 961 (1916). Instead, in Washington, the right to a

jury trial in civil matters is protected solely by the Washington Constitution. *Sofie*, 112

Wn.2d at 644.

Washington courts "have long interpreted article I, section 21 as guaranteeing

those rights to trial by jury that existed at the time of the constitution's adoption in 1889."

*Bird v. Best Plumbing Grp., LLC*, 175 Wn.2d 756, 768, 287 P.3d 551 (2012) . To

determine whether the historical right existed, "'the court examines (1) whether the cause

of action is one to which the right to a jury trial applied in 1889, and (2) the scope of the

right to a jury trial.'" *Id.* at 768 (quoting *Nielson v. Spanaway Gen. Med. Clinic, Inc.,*

135 Wn.2d 255, 266, 956 P.2d 312 (1998)). Additionally, "[i]t is well established that

the right to a jury trial exists where a case is purely legal in nature but does not exist

where a case is purely equitable." *Id.* at 769. Further, no right to a jury trial attaches to "'statutorily created actions without common law analogues.'" *Bird*, 175 Wn.2d at 769 (quoting *State v. State Credit Ass'n*, 33 Wn. App. 617, 621, 657 P.2d 327 (1983). Even where the right to a jury trial has historically existed, in some instances, the legislature has the authority to modify or abolish causes of action and replace them with alternative remedies that may not include a jury trial. *See Afoa v. Dep't of Lab. & Indust.*, 3 Wn. App. 2d 794, 808-10, 418 P.3d 190 (2018).

Of Penhall's 106-page brief, it dedicates roughly three pages to its constitutional argument of first impression. L&I's response to this constitutional argument garners less than a page of its 70-page brief. Additionally, Penhall's argument is conclusory and fails to provide analysis using the proscribed framework under *Jarksey* or article I, section 21. While the *Jarksey* case is similar to the present case insofar as both concern administrative agencies which sought civil penalties punitive in nature without a jury, the similarities end there, and citation to *Jarksey* alone cannot carry the day for Penhall here.

Ultimately the parties' briefing amounts to "passing treatment" of what would otherwise be a monumental change in the law, and their briefing is not sufficient for this court to consider the substance of this issue. *See Glacier*, 32 Wn. App. 2d at 209 ("Glacier's vagueness, due process, and equal protection claims, all condensed into a mere five pages, were conclusory or did not follow the prescribed analytic framework and provide argument as to how the controlling law applied to the facts in this case.").

53

6. ATTORNEY FEES

Both parties request attorney fees on appeal.

RCW 39.12.065(1) provides in pertinent part "[a] judicial appeal from the director's determination may be taken in accordance with chapter 34.05 RCW, with the prevailing party entitled to recover reasonable costs and attorneys' fees." "While the PWA does not define 'prevailing party,' courts have interpreted the phrase to mean the party 'that receives judgment in its favor.'" *Id.* at 212 (quoting *Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc.*, 160 Wn. App. 728, 740, 253 P.3d 101 (2011)). In applying attorney fees under other statutory provisions, our courts have ordinarily held where "neither party wholly prevails then the party who substantially prevails is the prevailing party, a determination that turns on the extent of the relief afforded the parties." *See Marassi v. Lau*, 71 Wn. App. 912, 916, 859 P.2d 605 (1993), *abrogated on other grounds* by *Wachovia SBA Lending, Inc. v. Kraft*, 165 Wn.2d 481, 200 P.3d 683 (2009) (applying the attorney fee provision in RCW 4.84.330).

Although Penhall prevails on the issue concerning the strike imposed against it, L&I prevails on all remaining issues. We therefore find L&I is the substantially prevailing party and award attorney fees in an amount to be determined by a commissioner of this court upon compliance with RAP 18.1.

We conclude that the director erred when he imposed a strike against Penhall and we remand with instructions for the director to strike this penalty. Otherwise, we affirm the director's order and award L&I its reasonable attorney fees.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, C.J.

WE CONCUR:

_____
Murphy, J.

_____
Cooney, J.